MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2014 ME 7
Docket:        BCD-12-583
Argued:        September 11, 2013
Decided:       January 21, 2014

Panel:         SAUFLEY, C.J., and ALEXANDER, <u>LEVY</u>, MEAD, GORMAN, and JABAR, JJ.


FORD MOTOR COMPANY

v.

DARLING'S et al.


LEVY, J.

[¶1]  This appeal concerns the respective rights of automobile manufacturers and dealers pursuant to the Business Practices Between Motor Vehicle Manufacturers, Distributors and Dealers Act (Dealers Act), 10 M.R.S. §§ 1171 to 1190-A (2013).[1]  The Dealers Act regulates the franchise relationship between automobile manufacturers/franchisors and dealers/franchisees.  We have previously addressed sections of the Dealers Act related to reimbursement for warranty repairs and parts.  *See, e.g.*, *Darling's v. Ford Motor Co.*, 2006 ME 22, 892 A.2d 461.  This appeal presents the more fundamental questions of what constitutes a "franchise" for purposes of the Dealers Act and what authority is

---

[1]  All citations to the Dealers Act are made to the statute currently in effect, 10 M.R.S. §§ 1171 to 1190-A (2013).  The Dealers Act has been amended since this case was initiated in 2006, though not in any way that affects this appeal.  *See, e.g.*, P.L. 2009, ch. 432, § 2 (effective June 17, 2009) (codified at 10 M.R.S. § 1174(3-A) (2009)).

delegated to the Maine Motor Vehicle Franchise Board to enforce the Act's provisions.

[¶2] Ford Motor Company, an automobile manufacturer and franchisor, appeals from a judgment entered in the Business and Consumer Docket (*Nivison, J.*) rendering final the court's affirmance of certain decisions and orders of the Maine Motor Vehicle Franchise Board ("the Board"). The Board concluded that Ford violated 10 M.R.S. § 1174(3)(B) by terminating an incentive program without providing Darling's, an automobile dealer and franchisee, with written notice by certified mail. As a result, the Board awarded Darling's damages and imposed a civil penalty and attorney fees against Ford pursuant to 10 M.R.S. §§ 1171-B(3) and 1173.

[¶3] Ford contends that the Board and the court erred in concluding that (1) the incentive program was part of Ford and Darling's "franchise" as that term is defined by the Dealers Act; (2) Darling's did not receive adequate notice of the program's termination; and (3) Ford was not entitled to a de novo jury trial on the factual issues decided by the Board. Darling's and the Maine Automobile Dealers Association (MADA)[2] cross-appeal, asserting that the Board's damages calculation and award of only one civil penalty against Ford were in error. We affirm the

---

[2] In July 2010, MADA moved to intervene in the proceedings before the Business and Consumer Docket. The court apparently granted MADA intervenor status, although the record contains only MADA's unsigned motion to intervene on July 30, 2010, without any court order granting that motion. Nonetheless, subsequent docket entries identified MADA as an intervenor.

judgments of the Board and the Business and Consumer Docket in all respects but one. Because we conclude that the Dealers Act does not authorize the Board to award monetary damages, we vacate that aspect of the judgment and remand the case to the Business and Consumer Docket for a determination of damages by a jury.

## I. BACKGROUND

### A. Darling's and Ford's Franchise Relationship

[¶4] Darling's is a Ford dealer and franchisee located in Bangor. The franchise relationship between Ford and Darling's is governed by a written Ford Service and Sales Agreement ("SSA") that Ford and Darling's entered into in 1989. The SSA recognized Darling's as an authorized Ford products dealer and granted Darling's the right to sell those products that "from time to time are offered for sale by [Ford]." The SSA also provided that Ford may issue "guides" establishing "reasonable standards" for dealership facilities and operations, and that it may publish bulletins "from time to time" to establish "prices, charges, discounts and other terms of sale."

### B. The Blue Oval Certified Incentive Program

[¶5] In 2000, Ford introduced the Blue Oval Certified ("BOC") program, a customer-satisfaction incentive program that offered Ford dealers a 1.25% cash bonus on the retail price of each vehicle the dealer sold. The BOC program was

described in "reference guides" issued between 2001 and 2004. The guides identified certification requirements for each year of the program, but did not describe any requirements beyond March 31, 2005. Dealers could qualify for BOC status by meeting customer approval standards set by Ford. Darling's was certified as a BOC dealer in 2001, and by 2002 it became aware that Ford was considering changes to the program. In August 2004, Ford made a broadcast on its internal Fordstar television network announcing to dealers that the BOC program would conclude by March 2005 and be replaced by a program emphasizing non-cash incentives. Ford issued an electronic communication to its dealers a few days later confirming the BOC program's termination as of March 31, 2005. It is unclear from the record whether Darling's management actually watched the Fordstar broadcast, though they were notified of it, or saw the electronic communication. Regardless, the record establishes that by 2004 Darling's management knew that Ford was considering discontinuing the cash bonus program. The BOC program was discontinued as scheduled on April 1, 2005, and was followed by an "Accelerated Sales Challenge," which lasted from 2005 to 2007, and a series of quarterly sales drives throughout 2007.

[¶6] Had the BOC program remained in effect, Darling's would have earned $678,942.96 in cash bonuses for vehicles it sold between April 1, 2005, and November 30, 2007. During the same period, Darling's received $142,975 in

payments from Ford under the Accelerated Sales Challenge and $74,200 under the 2007 quarterly sales drives.

C.    Administrative Proceedings Before the Maine Motor Vehicle Franchise Board

[¶7]  In December 2006, Darling's filed a twelve-count complaint before the Board alleging Ford's violations of the Dealers Act.  Count X, the only count at issue in this appeal, alleged that Ford's termination of the BOC program in March 2005 constituted a modification of the SSA that substantially and adversely affected Darling's rights, obligations, investment, or return on investment, and that Ford violated section 1174(3)(B) by not providing Darling's with 90 days' written notice by certified mail.  In May 2008, the Board ruled that Ford's termination of the BOC program constituted a modification of Darling's "franchise" (as defined by section 1171(6)) that substantially and adversely affected Darling's return on investment and therefore triggered the requirement of section 1174(3)(B) that Ford give 90 days' written notice to Darling's.  Accordingly, because the Board concluded that Ford knowingly violated section 1174(3)(B) and never corrected the violation, the Board levied a single civil penalty of $10,000, the maximum amount permitted by section 1171-B(3).  The Board also found that Darling's had sustained 270 days' worth of damages, in the amount of $214,723.08, accruing from the BOC program's termination on April 1, 2005.  The Board arrived at the

270-day period by adding the 90-day notice period within which a dealer may object to a proposed franchise modification to the subsequent 180-day period within which the Board must determine whether the manufacturer has good cause to implement the proposed modification. *See* 10 M.R.S. § 1174(3)(B). The Board then reduced its damages award by the $68,875 that Darling's earned through other promotional programs during the 270-day period. Accordingly, the Board awarded Darling's $145,223.08 plus attorney fees pursuant to section 1173.[3]

D.     Superior Court Proceedings

[¶8]  In July 2008, Ford and Darling's filed in the Superior Court, pursuant to M.R. Civ. P. 80C, 10 M.R.S. § 1189-B, and 5 M.R.S. §§ 11001-11008 (2012), separate petitions for review of the Board's administrative action.[4] Ford sought modification and reversal of the Board's decision as well as a declaratory judgment that section 1189-B violates Ford's right to a jury trial pursuant to article I, section 20 of the Maine Constitution by imposing a presumption that the Board's factual findings are correct unless rebutted by clear and convincing evidence. In contrast,

---

[3] On June 23, 2008, the Board reduced its damages award from $150,848.08 to $145,223.08 based on a clerical error in the Board's May 2008 order. We note that this calculation is slightly in error because $68,875 from $214,723.08 is $145,848.08, not $145,223.08. Additionally, the Board's order purported to award damages to Darling's "pursuant to § 1171-B(3) of the Franchise Law." Because section 1173, not section 1171-B(3), governs damages, this appears to be a clerical error.

[4] In their respective petitions for review of an administrative action filed in the Superior Court, Ford and Darling's named the Secretary of State as a party because the Secretary is responsible for operating and administering the Board. *See* 10 M.R.S. § 1187(7) (establishing the Board's affiliation with the Department of Secretary of State, Bureau of Motor Vehicles). The Secretary of State did not participate in the present appeal.

Darling's argued that the Board erred in awarding damages only for the 270-day period and in offsetting those damages by the amounts Darling's earned through the other incentive programs. Darling's also contested the Board's assessment of only one civil penalty against Ford. Darling's and Ford's petitions were ultimately consolidated and transferred to the Business and Consumer Docket.

[¶9] In July 2009, the court ordered a jury trial pursuant to section 1189-B for further fact-finding regarding whether the BOC program was within the scope of Darling's and Ford's "franchise." With respect to Ford's claim that section 1189-B violated Ford's constitutional right to a jury trial, the court determined that Ford's right could be preserved by detailed jury instructions informing the jury of the Board's factual findings and instructing it that, to prevail at trial, Ford must prove by clear and convincing evidence that the Board's factual findings were incorrect, pursuant to section 1189-B(2). The court held a jury trial in March 2011 on the factual issues of (1) whether termination of the BOC program constituted a modification of the franchise, and (2) if so, whether that modification had a substantial and adverse effect on Darling's investment or return on investment.[5]

---

[5] By Ford and Darling's agreement, the court did not present the issues of damages or the civil penalty to the jury, deeming those to be legal questions that Ford and Darling's had preserved for appeal upon completion of the jury trial. The court also concluded that actual notice did not satisfy section 1174(3)(B)'s notice requirement because the plain language of the statute requires written notice by certified mail. The court thus precluded Ford from presenting to the jury the issue of whether actual notice satisfies section 1174(3)(B).

[¶10] At the conclusion of the trial, the jury returned a verdict affirming the Board's factual findings.[6] In February 2012, the court entered an order affirming the Board's award of one civil penalty in the amount of $10,000 pursuant to section 1171-B(3). In June 2012, the court entered an order affirming the Board's damages award as a factual determination supported by the record. Ford, Darling's, and MADA timely appealed.[7]

## II. STATORY FRAMEWORK AND ISSUES ON APPEAL

[¶11] The Dealers Act regulates the franchise relationship between automobile manufacturers/franchisors like Ford and dealers/franchisees like Darling's. *See* 10 M.R.S. §§ 1171 to 1190-A. The Dealers Act defines a "franchise" as follows:

> "Franchise" means an oral or written arrangement for a definite or indefinite period in which a manufacturer, distributor or wholesaler grants to a motor vehicle dealer a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto at wholesale, retail, leasing or otherwise.

10 M.R.S. § 1171(6).

---

[6] After the jury verdict was returned, Ford filed a motion for judgment as a matter of law requesting that the court vacate the verdict. Ford argued that the Board, in determining whether Ford's modification of the franchise affected Darling's "return on investment," incorrectly defined that term. Accordingly, Ford contended that the issue was not appropriate for the jury because the Board committed legal error. The court denied Ford's motion.

[7] In their respective notices of appeal, Ford, Darling's, and MADA appealed from a decision of the court entered on November 21, 2012, which served as a final judgment with respect to the court's prior decisions regarding Count X of Darling's complaint.

[¶12]  As part of its regulation of the franchise relationship, the Dealers Act prohibits manufacturers/franchisors from engaging in "unfair methods of competition and unfair and deceptive practices."  10 M.R.S. § 1174.  The alleged violations of the Dealers Act in this case arise pursuant to section 1174(3)(B), which deems it an unfair and deceptive practice to

> modify a franchise during the term of the franchise or upon its renewal, if the modification substantially and adversely affects the motor vehicle dealer's rights, obligations, investment or return on investment, without giving 90 days' written notice by certified mail of the proposed modification to the motor vehicle dealer, unless the modification is required by law or board order.

[¶13]  Due to the unique administrative process fashioned by the Dealers Act, this appeal requires us to review an assemblage of legal and factual determinations by the Board, the jury's decision to uphold the Board's factual findings, and legal conclusions reached by the Business and Consumer Docket. The threshold legal question presented is whether, as Ford argues, the Board erred in concluding that the parties' franchise encompassed the BOC program.  If the program was not encompassed by the franchise, then Ford was not required to give notice of the program's termination pursuant to section 1174(3)(B) and Darling's was not entitled to any relief pursuant to the Dealers Act.  Ford contends that, even if the BOC program were part of the franchise, the notice it gave Darling's substantially complied with section 1174(3)(B) and should therefore be deemed

sufficient. Ford also asserts that its right to a jury trial pursuant to article I, section 20 of the Maine Constitution was infringed by section 1189-B(2)'s presumption that the Board's factual findings are correct unless rebutted by clear and convincing evidence.

[¶14] Darling's and MADA cross-appeal on the grounds that the Board committed legal error in calculating Darling's damages pursuant to section 1173 by limiting those damages to a 270-day period and reducing them by the amounts Darling's earned through alternative incentive programs. Darling's and MADA also argue that the Board erred in levying only a single $10,000 penalty against Ford pursuant to section 1171-B(3).

A.    Standard of Review

[¶15] When the Business and Consumer Docket acts in an intermediate appellate capacity to review an administrative agency's decision pursuant to M.R. Civ. P. 80C, we directly review the agency's decision for errors of law. *See Dyer v. Superintendent of Ins.*, 2013 ME 61, ¶ 11, 69 A.3d 416; *Carrier v. Sec'y of State*, 2012 ME 142, ¶ 12, 60 A.3d 1241. We review matters of statutory and constitutional interpretation, including the Board's interpretation of "franchise" pursuant to section 1171(6) and the court's determination that section 1189-B does not deprive Ford of its constitutional right to a jury trial, de novo. *See McGee v. Sec'y of State,* 2006 ME 50, ¶ 5, 896 A.2d 933.

B.      Administrative and Adjudicative Authority Pursuant to the Dealers Act

[¶16]  The Dealers Act vests specific administrative authority in the Board, appellate authority to review the Board's decisions in the Superior Court, and original jurisdiction for actions seeking damages or injunctive relief in the Superior Court.[8]  Recognizing these different sources of authority is essential to resolving the issues raised on appeal, and we identify each as a prelude to our analysis.

1.      The Board's Administrative Authority

[¶17]  As previously discussed, section 1174(3)(B) deems it an unfair and deceptive practice for a manufacturer to modify a franchise during the term of the franchise or upon its renewal if the modification substantially and adversely affects the dealer's rights, obligations, investment, or return on investment, without giving 90 days' written notice by certified mail of the proposed modification, unless the modification is otherwise required by law or an order of the Board. Section 1174(3)(B) further provides that, within the 90-day notice period, the dealer may file with the Board a protest requesting a determination of whether there exists

---

[8]  Sections 1190 and 1190-A recognize that a franchisee may bring a civil action in "the courts of the State" or "in a court of competent jurisdiction," respectively, for alleged violations of the Dealers Act. Because the present case was appealed from the Board to the Superior Court pursuant to section 1189-B, we do not address the extent to which the District Court has concurrent jurisdiction over original actions brought pursuant to the Dealers Act that seek damages but not equitable relief.  *See* 4 M.R.S. § 152(2) (2013) (establishing the District Court's original jurisdiction as being concurrent with that of the Superior Court over "all civil actions when no equitable relief is demanded, except those actions for which exclusive jurisdiction is vested in the Superior Court by statute"); *see also* 10 M.R.S. § 1173(1) (providing that any franchisee or dealer aggrieved pursuant to the Dealers Act "may bring an action for damages and equitable relief, including injunctive relief").  For the sake of simplicity, this opinion refers only to the Superior Court.

good cause for the proposed modification. Once a protest is filed, the Board must promptly schedule a hearing and decide the matter within 180 days. *Id.* The manufacturer has the burden of proving good cause, and the proposed modification may not take effect while the Board's determination of the matter is pending. *Id.*

[¶18] The Board's duties are set out in more detail in section 1188. That section authorizes the Board to review complaints filed pursuant to the Dealers Act, issue written decisions and orders to franchisees or franchisors found to be in violation of the Act, levy civil penalties against manufacturers found to be in violation of the Act pursuant to section 1171-B(3), and award costs and attorney fees to prevailing franchisees pursuant to section 1173. 10 M.R.S. § 1188(1)-(4).

2.     The Superior Court's Appellate Jurisdiction

[¶19] The Dealers Act provides that parties may appeal from the Board's legal and factual determinations to the Superior Court. 10 M.R.S. § 1189-B. If the appeal only alleges that the Board made an error of law, "[a]dditional evidence may not be heard or taken by the Superior Court." *Id*. § 1189-B(1). A party may also "appeal to the Superior Court for a hearing on the merits of the dispute," in which case "all findings of fact of the board are presumed to be correct unless rebutted by clear and convincing evidence." *Id*. § 1189-B(2). Section 1189-B(2) further states that "[a]n appeal for hearing is subject to the provisions of section 1173," which authorizes franchisees and dealers who suffer loss as the result of an

unfair trade practice to bring actions for damages and equitable relief. Finally, section 1189-B(2) provides that in any appeal for hearing the Board's decision must be admitted in evidence, and that "[t]here is a right to trial by jury in any action brought in Superior Court under this section."

3.      The Superior Court's Original Jurisdiction

[¶20]   The Board is not the only avenue for franchisees to pursue claims pursuant to the Dealers Act. The statute's legislative history reflects that "[t]he board is not the exclusive venue for initially bringing a complaint." L.D. 1294, Summary (121st Legis. 2003). Sections 1173, 1190, and 1190-A recognize that a franchisee or dealer may bring a civil action in the Superior Court for alleged violations of the Dealers Act, independent of the administrative procedures available before the Board. Section 1173(1) provides, in relevant part:

> **1. Civil remedies.** Any franchisee or motor vehicle dealer who suffers financial loss of money or property, real or personal, or who has been otherwise adversely affected as a result of the use or employment by a franchisor of an unfair method of competition or an unfair or deceptive act or any practice declared unlawful by this chapter may bring an action for damages and equitable relief, including injunctive relief. When the franchisee or dealer prevails, the court shall award attorney's fees to the franchisee or dealer, regardless of the amount in controversy, and assess costs against the opposing party.

[¶21]   Sections 1190 and 1190-A address the interaction between civil actions in the Superior Court and administrative actions pursuant to the Dealers

Act. "If a complaint is filed with the board by a person otherwise entitled to bring a complaint in the courts of the State, then the applicable statute of limitations is tolled and a civil action in a court of competent jurisdiction is barred pending the outcome of proceedings before the board." 10 M.R.S. § 1190. Further, a civil action filed in the Superior Court must be stayed "if, within 60 days after the date of filing of the complaint, or service of process, whichever date is later, a party to the action files a complaint with the board asserting the claims or defense under [the Dealers Act]." 10 M.R.S. § 1190-A. Also, as previously noted, an "appeal for hearing" from a decision of the Board to the Superior Court is subject to section 1173, which governs actions seeking damages or equitable relief to remedy unfair trade practices. 10 M.R.S. § 1189-B(2).

[¶22] Having reviewed the Dealers Act's delegation of authority to the Board and the Superior Court, we turn to the issues presented by this appeal.

### III. DISCUSSION

A. The Meaning of "Franchise" Pursuant to 10 M.R.S. §§ 1171(6) and 1174(3)(B)

[¶23] Ford first argues that the Board erred in concluding that Ford modified Darling's franchise pursuant to section 1174(3)(B) when it terminated the BOC program, because the BOC program was not part of Darling's and Ford's "franchise" as that term is defined by section 1171(6). We begin by looking to the

plain meaning of "franchise" as the Dealers Act defines the term. *See N.A. Burkitt, Inc. v. Champion Road Mach. Ltd.*, 2000 ME 209, ¶¶ 5-6, 763 A.2d 106 (examining the plain meaning of "motor vehicle" in order to define that term pursuant to the Dealers Act). Section 1171(6) defines a "franchise" as

> an oral or written arrangement for a definite or indefinite period in which a manufacturer, distributor or wholesaler grants to a motor vehicle dealer a license to use a trade name, service mark or related characteristic, and in which there is a community of interest in the marketing of motor vehicles or services related thereto at wholesale, retail, leasing or otherwise.

[¶24] A franchise is, therefore, an oral or written arrangement. *Id.* However, the statute offers little guidance as to what constitutes an "arrangement." Ford argues that "arrangement" should be interpreted narrowly to mean only the written SSA between Ford and Darling's that created the franchise, and not subsequent incentive programs such as the BOC program. This position finds some support in the statute's definition of a franchise as an arrangement in which a manufacturer *grants* a license, which arguably implies a one-time event (the "granting") that would not include the later BOC program. *Id.* However, in contrast with other states' definitions of "franchise," the Dealers Act does not define the term as a singular contract. *Cf.* Neb. Rev. Stat. § 60-1401.19 (2010) (defining "franchise" as a "contract"); Va. Code. Ann. § 46.2-1500 (West 2010) ("written contract or agreement"); Tex. Occ. Code Ann. § 2301.002(15) (West

2013) ("one or more contracts"). Instead, the statute employs the term "arrangement," which implies a broader course of dealing than the one-time occurrence of Ford and Darling's entering into the SSA.

[¶25] In interpreting statutes, we "consider the whole statutory scheme for which the section at issue forms a part so that a harmonious result, presumably the intent of the Legislature, may be achieved." *Hallissey v. Sch. Admin. Dist. No. 77*, 2000 ME 143, ¶ 14, 755 A.2d 1068 (quotation marks omitted). The Dealers Act's use of "franchise" in other contexts weighs against the construction proposed by Ford. Some sections of the Dealers Act refer to the "franchise relationship," and deem it an unfair and deceptive trade practice for a manufacturer to cancel, terminate, or fail to renew that "franchise relationship" under certain circumstances. *See* 10 M.R.S. § 1174(3)(O)-(S). Other sections prohibit interference with the franchise "agreement." *See id.* § 1174(3)(A), (N)-(R), (U). The statute's use of "franchise" in connection with an "arrangement," an "agreement," and a "relationship" supports construing the term to encompass the broader course of dealing between Ford and Darling's so as to include the BOC program. *See* 10 M.R.S. §§ 1171(6), 1174(3)(A), (N)-(S), (U).

[¶26] This construction of "franchise" also finds support in the framework of the SSA at issue in this case. The SSA expressly contemplated the inclusion of various future obligations between the parties. The SSA's definitions of "vehicle

terms of sale bulletin," "parts and accessories terms of sale bulletin," "customer service bulletin," "dealer's locality," "car planning volume and truck planning volume," "UIO (units in operation)," and "guides" all dictate that Ford could unilaterally issue new terms and conditions after the SSA was entered into. These conditions make clear that Ford retained the discretion to change which vehicles and parts Darling's could sell; where Darling's could conduct its sales and service; the standards for Darling's facilities, equipment, and service; and prices, charges, discounts, allowances, rebates, refunds, and other terms of sale. In light of these forward-looking provisions, the BOC program is best viewed as a future provision contemplated by the SSA rather than a new and independent contract as Ford contends.

[¶27] Viewed holistically, the SSA and the BOC program are part of the overall franchise "arrangement" that existed between Ford and Darling's. Accordingly, because the jury found that Ford's termination of the BOC program was an attempt to "modify a franchise during the term of the franchise" pursuant to section 1174(3)(B), Ford's termination of the program triggered the notice requirement of section 1174(3)(B). This conclusion requires us to confront whether Ford complied with section 1174(3)(B)'s notice requirement.

B.    The Notice Requirement of 10 M.R.S. § 1174(3)(B)

[¶28]   Pursuant to section 1174(3)(B), a manufacturer must give 90 days' written notice by certified mail to a dealer before modifying a franchise, if such modification "substantially and adversely affects the motor vehicle dealer's rights, obligations, investment or return on investment."  Although Ford does not dispute that it failed to provide Darling's with written notice by certified mail before discontinuing the BOC program, it urges us to treat the failure as inconsequential because Darling's had actual notice that the program would end.

[¶29]   Ford points to our decisions holding that strict compliance with statutory notice requirements is not always necessary.  For example, in *Givertz v. Maine Medical Center*, 459 A.2d 548 (Me. 1983), we interpreted the Maine Health Security Act, 24 M.R.S.A. §§ 2501-2905 (Supp. 1982-83), to require that a notice of claim before suit be served within the applicable statute of limitations, but we recognized that a defective notice might suffice in certain circumstances.  459 A.2d at 554.  We reasoned that even when a statutory notice requirement uses the mandatory word "shall," certain requirements regarding the details of the notice (such as its verification and service) could be regarded as merely "directory" if such details are not "of the very essence of giving notice" and if the failure to strictly comply with them would not prejudice the rights of interested parties.  *Id.*;

*see also Seider v. Bd. of Exam'rs of Psychologists*, 1998 ME 78, ¶¶ 4-7, 710 A.2d 890.

[¶30]  In the context of the Dealers Act, providing written notice by certified mail is "of the very essence of giving notice."  The record demonstrates that automobile dealers receive many communications from manufacturers, often through informal means such as postings to websites or electronic communications.  It is therefore understandable that the Legislature would impose a strict, though certainly not burdensome, notice requirement on manufacturers whenever they make a modification to a franchise that "substantially and adversely affects the motor vehicle dealer's rights, obligations, investment or return on investment."  10 M.R.S. § 1174(3)(B).  Additionally, Ford's failure to give written notice by certified mail prejudiced Darling's by depriving it of the opportunity provided by section 1174(3)(B) to file a protest and request a determination by the Board as to whether Ford had good cause for the modification.  Because the statutory scheme here intends to ensure that the Board has the opportunity to review claims of unfair trade practices within an expedited schedule, requiring the manufacturer to give a specific form of notice to "start the clock running" is

essential.[9]  Accordingly, we construe section 1174(3)(B)'s notice requirement to be mandatory.  *See Givertz*, 459 A.2d at 554.

[¶31]  For these reasons, we affirm the Board's conclusion that compliance with section 1174(3)(B)'s notice requirement is mandatory, and that Ford violated the statute by failing to provide Darling's with 90 days' written notice by certified mail before it terminated the BOC program.  Accordingly, Ford's alternative efforts to notify its franchisees that the BOC program would end, and Darling's actual knowledge of the termination of the BOC program, are insufficient to satisfy the requirement of section 1174(3)(B).

C.    The Presumption Established by 10 M.R.S. § 1189-B(2) and Ford's Right to a Jury Trial Pursuant to Article I, Section 20 of the Maine Constitution

[¶32]  Next, Ford contends that section 1189-B(2) is unconstitutional because it requires a party challenging a finding by the Board to prove by clear and convincing evidence that the finding was erroneous, thereby infringing on the party's right to a jury trial as provided by article I, section 20 of the Maine

---

[9]  Although this Court has shown some flexibility in interpreting statutory notice requirements, we have usually done so in the context of construing a notice provision that affects a statute of limitations. *See, e.g., Frame v. Millinocket Reg'l Hosp.*, 2013 ME 104, ¶¶ 14-27, --- A.3d --- (holding that, for purposes of amendment, a properly sworn notice of claim may relate back to a defective unsworn notice of claim filed before the expiration of the statute of limitations); *Michaud v. N. Me. Med. Ctr.*, 436 A.2d 398, 402 (Me. 1981) (holding that a defective notice of claim, served in advance of filing of complaint and expiration of statute of limitations, did not warrant dismissal).  Specific notice requirements are otherwise applied as they are written.  *See Seider v. Bd. of Exam'rs of Psychologists,* 1998 ME 78, ¶¶ 4-6, 710 A.2d 890 (interpreting the Administrative Procedure Act and holding that "[w]e decline to interpret section 9061 so as to strike 'written' from that section's 'written notice' requirement as if it were a mere technicality"); *see also Bell v. Walton*, 2004 ME 146, ¶¶ 7-12, 861 A.2d 687 (interpreting the Maine Limited Liability Company Act and holding that strict compliance with the statutory notice requirement is necessary to effectuate a member's voluntary withdrawal from a limited liability company).

Constitution. Ford argues that it was entitled to de novo fact-finding by the jury on all issues presented to the Board.

[¶33] We review alleged constitutional violations de novo. *Sparks v. Sparks*, 2013 ME 41, ¶ 19, 65 A.3d 1223. In challenging the constitutionality of section 1189-B(2), Ford bears the "heavy burden" of overcoming the presumption that the statute is constitutionally valid. *Irish v. Gimbel*, 1997 ME 50, ¶ 6, 691 A.2d 664. To meet its burden, Ford must demonstrate "by strong and convincing reasons" that the statute conflicts with the Maine Constitution. *State v. McGillicuddy,* 646 A.2d 354, 355 (Me. 1994) (quotation marks omitted); *id.* All reasonable doubts must be resolved in favor of the constitutionality of the statute, and if the statute is susceptible to more than one interpretation "we must adopt an interpretation, if one there be, which will render it constitutional." *Portland Pipe Line Corp. v. Envtl. Improvement Comm'n,* 307 A.2d 1, 11 (Me. 1973).

[¶34] Turning to the Maine Constitution, article 1, section 20 provides:

In all civil suits, and in all controversies concerning property, the parties shall have a right to a trial by jury, except in cases where it has heretofore been otherwise practiced; the party claiming the right may be heard by himself or herself and with counsel, or either, at the election of the party.

Me. Const. art. I, § 20.[10] The right to a trial by jury is "the right to have a determination made by the jury on material questions of fact."[11] *Smith v. Hawthorne*, 2006 ME 19, ¶ 20, 892 A.2d 433 (quotation marks omitted).

[¶35] The challenged provision of the Dealers Act provides:

> **2. Appeal involving factual matters.** A party to a decision by the board may appeal to the Superior Court for a hearing on the merits of the dispute. In any such hearing before the Superior Court, all findings of fact of the board are presumed to be correct unless rebutted by clear and convincing evidence.

10 M.R.S. § 1189-B(2). Ford contends that section 1189-B(2)'s presumption in favor of the Board's factual findings deprived Ford of its constitutional right to a trial by jury. We have not previously considered the constitutionality of a statute or rule that restricts a jury's fact-finding function to a determination by clear and convincing evidence as to whether an administrative body's factual findings are erroneous. However, our prior decisions offer some guidance that the right to a

---

[10] The United States Constitution is not implicated here because the Seventh Amendment, which provides, "In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law," U.S. Const. amend. VII, generally does not apply to the states. *See Minneapolis & St. Louis R.R. Co. v. Bombolis*, 241 U.S. 211, 217 (1916); *Thermos Co. v. Spence*, 1999 ME 129, ¶ 7 n.2, 735 A.2d 484.

[11] Darling's and MADA do not contend that a historical exception to article 1, section 20 of the Maine Constitution applies in this case. Accordingly, we presume that the "broad constitutional guarantee to the right to a jury trial" applies to Darling's claims. *See State v. One 1981 Chevrolet Monte Carlo*, 1999 ME 69, ¶ 6, 728 A.2d 1259 ("We will presume there is a right to a jury in a civil case unless it is affirmatively shown that a jury trial was unavailable in such a case in 1820.") (quotation marks omitted).

jury trial is not an absolute bar to fact-finding by an administrative body with specialized experience.

[¶36]　In *Irish*, 1997 ME 50, 691 A.2d 664, we addressed whether a mandatory prelitigation screening process for medical negligence claims was inconsistent with the constitutional right to a jury trial.　*Id.* ¶¶ 6-14.　In that case, as required by statute, a screening panel made factual findings that were then presented to the jury "without explanation" of how the panel operated, thereby preventing the plaintiff from commenting on or challenging the findings. *Id.* ¶¶ 5-7, 10-11.　We held that the right to a jury trial was violated because providing non-jury factual findings to a jury without explaining the context for those findings "withholds information that is essential to the jury's fact-finding role" and "invite[s] unprincipled evaluation and can only result in juror confusion." *Id.* ¶ 11; *see also Smith*, 2006 ME 19, ¶¶ 22-24, 892 A.2d 433 (concluding that the right to a jury trial was violated by "asymmetrical" admission of the screening panel's findings that benefitted only one party).

[¶37]　In contrast, the right to a jury trial is not infringed by shifting burdens of proof or imposing rules of evidence.　For example, admitting a report that establishes a rebuttable presumption of a material fact is constitutionally permissible as a rule of evidence, provided that "'[i]t cuts off no defense, interposes no obstacle to a full contestation of all the issues, and takes no question

of fact from either court or jury.'" *Irish*, 1997 ME 50, ¶ 9, 691 A.2d 664 (quoting *Meeker v. Lehigh Valley R.R. Co.*, 236 U.S. 412, 430 (1915), which held that a federal statute making a commission's report prima facie evidence in a jury trial merely established a "rebuttable presumption" and did not infringe the right to a trial by jury).  As the United States Supreme Court has held in the context of the Federal Constitution's right to trial by jury, "[t]he [Seventh] Amendment, indeed, does not attempt to regulate matters of pleading or practice, or to determine in what way issues shall be framed by which questions of fact are to be submitted to a jury. . . .  So long as this substance of right is preserved, the procedure by which this result shall be reached is wholly within the discretion of the legislature . . . ." *Walker v. N.M. & S. Pac. R.R. Co.*, 165 U.S. 593, 596 (1897).

[¶38]  Here, the statutory presumption that the Board's findings are correct unless rebutted by clear and convincing evidence does not deprive litigants of the constitutional right to a jury trial because the presumption acts only as a burden of proof and preserves the jury's role in determining material factual issues.  *See Smith*, 2006 ME 19, ¶¶ 20-25, 892 A.2d 433; *Irish*, 1997 ME 50, ¶¶ 9-13, 691 A.2d 664.  Section 1189-B(2) does not restrict the jury's ability to consider the full context of the Board's determination (the principal concern in *Irish*), nor does it limit the parties' ability to introduce the Board's findings in evidence.  Indeed, the statute requires the admission of the Board's decision.  10 M.R.S. § 1189-B(2).

Accordingly, section 1189-B(2) does not interfere with the "substance" of the right to trial by jury. *See Walker*, 165 U.S. at 596.

[¶39] Additionally, proof by clear and convincing evidence is required in a wide variety of civil cases where public policy concerns demand a higher degree of certainty in factual findings. *Taylor v. Comm'r of Mental Health and Mental Retardation*, 481 A.2d 139, 149 (Me. 1984) (citing 9 Wigmore, *Evidence* § 2498 at 424-31 (Chadbourn rev. 1981)). As applied here, the Dealers Act reflects a legislative judgment that the factual determinations of an administrative board—one with expertise in the specialized area of motor vehicle franchise relationships—are sufficiently reliable as to require a heightened standard of proof before they are disregarded. *See* 10 M.R.S. § 1187(1) (establishing the membership of the Maine Motor Vehicle Franchise Board to include individuals with experience as franchisees and franchisors); L.D. 1294, Summary (121st Legis. 2003) (establishing the Board as a forum "with specific expertise in the motor vehicle industry" in order to promptly resolve "complex and time-consuming litigation").

[¶40] For these reasons, we conclude that section 1189-B(2)'s presumption in favor of the Board's factual findings is consistent with, and does not unduly

burden, the right to trial by jury guaranteed by article I, section 20 of the Maine Constitution.[12]

D.     Damages Awards Pursuant to the Dealers Act

[¶41]    Having established that Ford's termination of the BOC program without notice by certified mail to Darling's constituted a violation of section 1174(3)(B) and that the jury's review of the Board's findings was proper, we turn to the Board's award of monetary damages to Darling's.  We first address Ford's assertion that the Board's award should be vacated because section 1188 of the Dealers Act, which establishes the Board's duties, does not authorize the Board to award damages.  Ford advanced this argument for the first time before this Court, and as such did not preserve it for appeal.  "Generally, a party in an administrative proceeding must raise any objections it has before the agency for the issue to be preserved for appeal." *Berry v. Bd. of Trs., Me. State Ret. Sys.*, 663 A.2d 14, 18 (Me. 1995) (citing *New England Whitewater Ctr., Inc. v. Dep't of Inland Fisheries & Wildlife*, 550 A.2d 56, 58 (Me. 1988)).  Nonetheless, the issue of jurisdiction may be raised at any time in a proceeding, including sua sponte by this Court.  *See In re Walter R.*, 2004 ME 151, ¶ 3, 863 A.2d 276; *Pederson v. Cole*, 501 A.2d 23, 25 n.2 (Me. 1985).  Because we conclude that the Board lacks jurisdiction over

---

[12]  Because we conclude that the jury's review of the Board's factual findings was proper, we need not address Ford's contention that the Board erred in finding that Ford's termination of the BOC program substantially and adversely affected Darling's return on investment.  The Board's findings were subjected to a review by the jury that comported with the Maine Constitution.

actions seeking damages pursuant to the Dealers Act, we vacate the judgment's award of monetary damages.

[¶42]  Administrative agencies like the Board are by their nature "limited in their operations within the framework established for them by the Legislature." *Clark v. State Emps. Appeals Bd.*, 363 A.2d 735, 736 (Me. 1976).  As an administrative tribunal, the Board possesses only such "jurisdiction, powers and authority as are conferred upon it by express legislative grant or such as arise therefrom by implication as necessary and incidental to the full and complete exercise of the powers granted."  *Conners' Case*, 121 Me. 37, 40, 115 A. 520 (1921).  Here, the Board's authority to hear and decide cases is governed by section 1188, and is qualified by sections 1173, 1189-B, 1190, and 1190-A.  We therefore look to these sections to ascertain whether the Board has jurisdiction over actions seeking damages pursuant to the Dealers Act.  *See Clark*, 363 A.2d at 736; *Conners' Case*, 121 Me. at 39, 40, 115 A. 520; *see also Town of Eagle Lake v. Comm'r, Dep't of Educ.*, 2003 ME 37, ¶ 7, 818 A.2d 1034 ("To determine the intent of the Legislature, we look first to the statute's plain meaning . . . ." (quotation marks omitted)).

[¶43] Section 1188, which establishes the Board's duties, does not authorize the Board to award damages to plaintiffs who prevail under the Dealers Act. Section 1188 empowers the Board to review complaints, issue written decisions

and orders, levy civil penalties, and award attorney fees and costs, but it does not on its face authorize the Board to award damages. 10 M.R.S. § 1188(1)-(4). Because "[w]e will not read additional language into a statute," *Blue Yonder, LLC v. State Tax Assessor*, 2011 ME 49, ¶ 10, 17 A.3d 667, we presume that if the Legislature had intended for the Board to make damages decisions it would have said so, *see Pease v. Foulkes*, 128 Me. 293, 298, 147 A. 212 (1929) (favoring the interpretation of statutes "without resorting to subtle and forced constructions for the purpose of either limiting or extending their operation").

[¶44] Instead, the right to damages pursuant to the Dealers Act is governed by section 1173(1), which, as discussed above, provides in part:

> **1. Civil Remedies.** Any franchisee or motor vehicle dealer who suffers financial loss of money or property, real or personal, or who has been otherwise adversely affected as a result of the use or employment by a franchisor of an unfair method of competition or an unfair or deceptive act or any practice declared unlawful by this chapter may bring an action for damages and equitable relief, including injunctive relief.

Further, section 1189-B(2), which governs appeals from the Board to the Superior Court, provides that an appeal for a hearing on the merits of the dispute before the Superior Court "is subject to the provisions of section 1173." Thus, once a proceeding before the Board is completed and an appeal is taken on the merits pursuant to section 1189-B(2), a franchisee may then bring its action for damages pursuant to section 1173 as part of the hearing before the Superior Court. An

action for damages brought pursuant to section 1173 is therefore separate from an administrative complaint filed with the Board pursuant to section 1188(1).

[¶45]  Additionally, sections 1190 and 1190-A explicitly recognize that a franchisee may bring an original civil action in the Superior Court for alleged violations of the Dealers Act, independent of the administrative complaint process before the Board.  *See also* L.D. 1294, Summary (121st Legis. 2003) ("The board is not the exclusive venue for initially bringing a complaint . . . .").  Such actions in the Superior Court must be stayed, though, "if, within 60 days after the date of filing of the complaint, or service of process, whichever date is later, a party to the action files a complaint with the board."  10 M.R.S. § 1190-A.

[¶46]  The Dealers Act thus sets forth a process by which plaintiffs claiming damages may seek them either (1) in an original action, or (2) in an appeal for a hearing on the merits filed with the Superior Court.  As made clear by the plain language and structure of the statute, it is the court, and not the Board, that may ultimately award damages.  Because the Board lacks jurisdiction over actions seeking damages pursuant to the Dealers Act, its award of damages to Darling's must be vacated.  *See Clark*, 363 A.2d at 736-39; *Conners' Case*, 121 Me. at 37, 40-43, 115 A. 520.

[¶47]  As a final matter, because the Board was not authorized to award damages, its damages determination is not to be treated as a factual finding subject

to the presumption of correctness established by section 1189-B(2). *See* 10 M.R.S. § 1189-B(2) ("In any such hearing [on appeal] before the Superior Court, all findings of fact of the board are presumed to be correct unless rebutted by clear and convincing evidence."). Instead, a plaintiff seeking damages bears the traditional burden of proof by a preponderance of the evidence. *See Trans Coastal Corp. v. Curtis*, 622 A.2d 1186, 1189 (Me. 1993) (holding that plaintiff failed to meet its burden of establishing damages by a preponderance of the evidence); *Foss v. Ingeneri*, 561 A.2d 498, 498-99 (Me. 1989) (holding that plaintiff retains the burden of proving damages by a preponderance of the evidence following entry of default judgment); *Dairy Farm Leasing Co., Inc. v. Hartley*, 395 A.2d 1135, 1138 (Me. 1978) ("It is fundamental in our law that the plaintiff has the burden of proving his damages.").

[¶48] For these reasons, the portion of the judgment awarding damages in the amount of $145,223.08 to Darling's is vacated. The case is remanded to the Business and Consumer Docket for a determination of damages, with the burden on Darling's to prove its damages by a preponderance of the evidence.

E.     The Board's Award of One Civil Penalty Pursuant to 10 M.R.S. § 1171-B(3)

[¶49] Finally, Darling's contends that the Board erred in levying only one civil penalty against Ford pursuant to section 1171-B(3) for Ford's violation of section 1174(3)(B). Section 1171-B(3) provides:

**3. Civil penalty.** If the board determines after a proceeding conducted in accordance with this chapter that a manufacturer or distributor is violating or has violated any provision of this chapter or any rule or order of the board issued pursuant to this chapter, the board shall levy a civil penalty of not less than $1,000 nor more than $10,000 for each violation. If the violation involves multiple transactions within a 60-day period, these multiple transactions are deemed a single violation.

Darling's argues that the Board should have levied multiple penalties against Ford under the reasoning that every BOC program payment that Ford withheld constituted a new violation of the Dealers Act. Under the terms of the BOC program, Ford paid Darling's a 1.25% cash bonus on the manufacturer's suggested retail price of each vehicle that Darling's sold. Thus, Darling's asserts that Ford violated the Dealers Act every time Darling's sold a Ford vehicle but did not receive a 1.25% cash bonus.

[¶50] We are not persuaded by Darling's characterization of what constitutes a "violation" of the Dealers Act. Under the plain language of section 1174(3)(B), Ford's "violation" was its use of an unfair or deceptive practice (i.e., substantially and adversely modifying the franchise without providing the required notice), not its failure to make each of its contractual payments. Because Ford only modified the franchise without providing notice once (at least for purposes of this dispute), it violated section 1174(3)(B) once, and it was properly subject to one civil penalty pursuant to section 1171-B(3).

32

The entry is:

> The portion of the judgment awarding money damages in the amount of $145,223.08 to Darling's is vacated. Remanded to the Superior Court for a determination of damages. The judgment is affirmed in all other respects.

---

**On the briefs:**

Judy A.S. Metcalf, Esq., and Noreen A. Patient, Esq., Eaton Peabody, Brunswick, for appellant Darling's

Michael Kaplan, Esq., Preti, Flaherty, Beliveau & Pachios, LLP, Portland, for appellant Maine Automobile Dealers Association

Daniel L. Rosenthal, Esq., and Lee H. Bals, Esq., Marcus, Clegg & Mistretta, P.A., Portland, for appellee/cross-appellant Ford Motor Company

**At oral argument:**

Judy A.S. Metcalf, Esq., for appellant Darling's

Michael Kaplan, Esq., for appellant Maine Automobile Dealers Association

Daniel Rosenthal, Esq., for appellee/cross-appellant Ford Motor Company

Business and Consumer Docket docket numbers AP-08-1; AP-08-2; AP-10-5
FOR CLERK REFERENCE ONLY