MLR/SC# 228-16

**FCA US LLC v. Matthew Dunlap in his capacity as Secretary of State of the State of Maine, & Darling's**

**BCD-AP-15-03**


**FCA US LLC**

William Vickerson
183 Middle St., Fourth Floor
Portland, ME 04112


**Matthew Dunlap, Secretary of State & Darling's**

James Haddow, Esq.
2 Monument Square, Suite 900
Portland, ME 04221

STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-AP-15-03

)
FCA US LLC, f/k/a CHRYSLER )
GROUP, LLC, )
)
)           **ORDER ON PETITIONER'S**
Petitioner, )           **M.R. Civ. P. 80C APPEAL**
)
v. )
)
)
MATTHEW DUNLAP, in his capacity as )
Secretary of State of the State of Maine, & )
DARLING's, )
)

Respondents.

FCA US LLC, formerly known as Chrysler Group and hereinafter referred to as

"Chrysler," appeals from the decision of the Maine Motor Vehicle Franchise Board (the

"Board") dated April 4, 2014 (the "Decision") as to Counts I, II, and III of the Complaint filed

by Respondent Darling's. [1] Counts I and II of the Complaint allege that Chrysler violated 10

M.R.S. § 1176 of the Dealers Act by failing to timely pay Darling's average percentage markup

on its reimbursement for warranty repairs performed after October 27, 2012. Count III alleges

that Chrysler violated Section 1176 of the Business Practices Between Motor Vehicle

Manufacturers, Distributors and Dealers Act ("Dealers Act") by failing to pay Darling's its

average percentage markup on "exchange parts" used in warranty repairs since January 30, 2009.

Count III also seeks a declaration that Section 1176 requires Chrysler to continue to pay that

markup on those parts. For the reasons discussed below the Court grants in part and denies in

part Chrysler's appeal.

---

[1] Although the Chrysler Group formally changed its name to FCA US LLC, the Court refers to FCA US
LLC as "Chrysler" in order to maintain consistency with the terminology utilized before the Board.

## I.  Background and Procedural History

Darling's sells new and used motor vehicles and is a franchisee of Chrysler operating under Sales and Service Agreements with Chrysler (the "Dealer Agreements"). (*See* R. 2721-2828.) Chrysler is a manufacturer of new motor vehicles and is a franchisor of Darling's. (*See id.*) As a Chrysler dealer, Darling's performs repairs on Chrysler vehicles pursuant to Chrysler warranties and its franchise with Chrysler. (R. 1600, 2780, 2797, 2814.) Because the repairs are covered by Chrysler warranties, the customer does not pay for the repairs. (*See, e.g.,* R. 2914.) Instead, Chrysler is required to reimburse Darling's for the warranty repairs it performs on Chrysler's behalf. (*Id.*) This includes reimbursement for both the labor associated with the repair and the parts used in the repair. (*Id.*)

On January 30, 2013, Darling's filed its four count Complaint against Chrysler with the Board. (R. 1-15.) Following hearings and argument submitted by the parties, the Board issued the Decision on April 4, 2014. On that same date, the Board issued an Order on Darling's request for attorney fees and costs. (R. 2714-2717.) Thereafter, both Chrysler and Darling's appealed portions of the Decision to the Superior Court. After briefing, the Court heard oral argument on the parties' respective appeals on July 17, 2015. On that date, the Court was informed that *Darling's Auto Mall v. General Motors, LLC*, PEN-15-82 was pending before the Law Court. The Court reviewed the briefing in that matter and determined that it was likely to be dispositive of the issues raised in Darling's appeal and potentially instructive as to Chrysler's appeal regarding exchange parts under Count III. As a result, the Court determined that it would await the Law Court's decision in *Darling's Auto Mall* before issuing a decision on the merits in the present case.

2

On March 31, 2016, the Law Court issued *Darling's Auto Mall v. GM LLC*, 2016 ME 48, __ A.3d __. On April 6, 2016, Darling's withdrew its appeal in light of that decision. On May 3, 2016, the Court held oral argument in this matter and another matter involving the same parties, *FCA US LLC v. Darling's*, BCD-AP-16-03. At oral argument, the parties confirmed that they did not wish to submit supplemental briefing in light of *Darling's Auto Mall* and that the present matter was ready for adjudication.[2]

## II. Standard of Review

When reviewing final agency action pursuant to M.R. Civ. P. 80C, the Court reviews that decision for abuse of discretion, errors of law or findings not supported by the evidence. *Centamore v. Dep't of Human Services*, 664 A.2d 369, 370 (Me. 1995). "An administrative decision will be sustained if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Seider v. Bd. of Examiner's of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551. The Court's review is limited to "determining whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering v. Sup't of Insurance*, 593 A.2d 1050, 1053 (Me. 1991). The focus on appeal is not whether the court would have reached the same conclusion as the agency, but whether the record contains competent and substantial evidence that supports the result reached by the agency. *See id.*

Furthermore, when the claimed error involves the interpretation of a statute, the Court reviews the Board's interpretation de novo. *See Ford Motor Co. v. Darling's*, 2014 ME 7, ¶ 15, 86 A.3d 35. However, "[w]hen the dispute involves an agency's interpretation of a statute administered by it, the agency's interpretation, although not conclusive, is entitled to great deference and will be upheld unless the statute plainly compels a contrary result." *Wood v.*

---

[2] The Court agrees with the parties' that further briefing was not necessary. The Court has read *Darling's Auto Mall v. GM LLC*, 2016 ME 48, __ A.3d __ and agrees with the parties' implicit representation that this case does not impact the questions at issue in the present matter.

3

*Superintendent of Ins.*, 638 A.2d 67, 70 (Me. 1994) (quotation omitted). If the statute is ambiguous, the Court reviews whether the agency's construction is reasonable. *Guilford Transp. Indus. v. Pub. Utils. Comm'n*, 2000 ME 31, ¶ 11, 746 A.2d 910 (citation omitted).

### III.   The Average Percentage Markup Dispute, Counts I and II

#### A. Underlying Facts

Prior to October 27, 2012, Chrysler reimbursed Darling's for parts used in warranty work at cost plus an 85% markup. (R. 2707, ¶ 2.) On September 27, 2012, Darling's submitted two average percentage parts markup declarations to Chrysler. (R. 2708, ¶ 4.) The submissions declared Darling's average percentage parts markup as 131% for its Ellsworth location and 113% for Augusta. (*Id.*) The Board found that Darling's submissions identified 398 consecutive repair orders for its Ellsworth location and 628 for Augusta. (*Id.* at ¶ 5.) Darling's entered the repair orders individually onto a spreadsheet and then identified the "100 sequential nonwarranty customer-paid service repair orders" (the "100 sequential orders") within each group that it used to establish its average percentage markups. (*Id.*) Darling's then sent copies of the 100 sequential orders selected to Chrysler. (*Id.*) Each set of 100 sequential orders included orders containing state inspections, routine maintenance, and accessories, but these repair orders were not used in calculating the average percentage markups. (*Id.* at ¶ 6; 3241-3622; 1821.)

Chrysler notified Darling's that it did not consider its submissions sufficient under Section 1176 on October 17, 2012 "because of the lack of sequential repair orders." (R. 2709, ¶ 7.) Chrysler asked Darling's to submit copies of all the repair orders that it had not supplied, but listed on the spreadsheet. (*Id.*) Darling's refused to do so. (*Id.*) "When other Maine dealers had established markups with Chrysler after 2003, they had supplied copies of all the repair orders referenced in their submissions." (*Id.*)

4

On November 29, 2012, Chrysler changed its position to the one sought by Darling's and began paying a markup of 131% for Darling's Ellsworth and Augusta dealerships. (*Id.* at ¶ 10.) Chrysler also paid the 131% markup on parts Darling's purchased for warranty repairs between October 27, 2012 and November 28, 2012. (*Id.*) Chrysler further paid the amount claimed due by Darling's in Count II for Ellsworth warranty repairs it had not reimbursed at the 131% markup. (*Id.* at ¶ 11.) Darling's reached its average percentage parts markup by calculating the average markup on each part and then averaging the averages. (*Id.* at ¶ 12.) Chrysler argued that this computation was not consistent with Section 1176, but did not seek to lower Darling's markup in the underlying Board action. (*Id.*)

B. The Board's Decision

The Board determined that Section 1176 does not require the submission of 100 sequential nonwarranty customer-paid service repair orders to be "consecutive" because "such repair orders are simply not generated by a dealer consecutively." (R. 2710, ¶ 23.) The Board also explained that Section 1176 does not require the dealer to submit each one of the larger groups of consecutive repair orders from which it drew the 100 sequential orders. (*Id.*)

Furthermore, the Board determined that out of the 100 sequential orders, those containing state inspections, routine maintenance, and accessories could not be counted towards the average percentage parts markup under Section 1176. (R. 2708, ¶ 6.) As a result, the Board concluded that the submissions included 59 so-called "qualifying repair orders" for the Ellsworth dealership, and 68 for Augusta. (*Id.*)

The Board also determined that Darling's method of computing its average percentage markup was appropriate under Section 1176 because the section did not set out a particular method of calculation. (R. 2711, ¶ 25.) As a result, the Board concluded that Darlings submitted

5

its repair orders "according to the law" and properly established its average percentage markup. (*Id.* at ¶ 26; R. 2712, ¶ 35.)

Based on the above findings of fact and conclusions of law, the Board determined that Chrysler violated Section 1176 by failing to timely pay Darling's the increase in its average percentage markup from 85% to 131%. (R. 2712, ¶ 35.) As a result, the Board imposed the maximum civil penalty permitted under Section 1171-B(3) of $10,000. (*Id.*)

## C. Discussion

Chrysler contends that Darling's declaration of its average percentage parts markup rate failed to meet section 1176's requirement of establishing the rate "by submitting to the franchisor 100 sequential nonwarranty customer-paid service repair orders....covering repairs made no more than 180 days before the submission and declaring the average percentage markup." 10 M.R.S. § 1176. This is because Darling's 100 nonwarranty customer paid-service repair orders were not in sequential order, did not include the larger subset from which the 100 repair orders were culled, and included non-qualifying orders involving state inspections, routine maintenance, and accessories. Chrysler also argues that Darling's manner of calculating its average percentage markup is mathematically flawed and unfairly inflates Darling's average percentage markup. Chrysler argues that the "average percentage markup" must be calculated by adding the cost of all of the parts and dividing this sum by the selling price of all the parts, not by calculating the percentage markup of each and every part identified in the repair orders, adding these percentages together, and then dividing that sum by the total number of repair orders.

Darling's responds that by Chrysler's logic, Darling's must perform 100 nonwarranty customer-paid service repair orders consecutively and ignore all other vehicles brought into its repair shop until those 100 repairs are completed. Darling's further responds that Section 1176

does not require repair orders involving state inspections, routine maintenance and accessories to be excluded all together from the 100 sequential orders. Instead, Section 1176 only excludes those particular repairs from factoring into the calculation of the markup. Darling's contends that Chrysler's alternate interpretation is only possible if the word "qualifying" is inserted into the statute. Finally, Darling's argues that the Board did not err in finding Darling's computation of the average percentage markups satisfied Section 1176 because the statute does not set out a required method of calculation.

Section 1176 provides, in pertinent part:

> For purposes of this section, the retail rate customarily charged by the franchisee for parts may be established by submitting to the franchisor 100 sequential nonwarranty customer-paid service repair orders or 60 days of nonwarranty customer-paid service repair orders, whichever is less in terms of total cost…and declaring the average percentage markup….Only retail sales not involving warranty repairs, not involving state inspection, not involving routine maintenance such as changing the oil and oil filter and not involving accessories may be considered in calculating the average percentage markup. A franchisor may not require a franchisee to establish the average percentage markup by an unduly burdensome or time-consuming method or by requiring information that is unduly burdensome or time-consuming to provide, including, but not limited to, part-by-part or transaction-by-transaction calculations.

10 M.R.S.A. § 1176 (2015).

In *Darling's Bangor Ford v. Ford Motor Co.*, the Superior Court (Penobscot County, *Hjelm, J.*) addressed issues that are virtually identical to those in the present dispute. 2006 Me. Super. LEXIS 110 (May 25, 2006). First, *Darling's Bangor Ford* determined that the plain language of Section 1176 was clear that franchisees were not required to submit any repair orders beyond the 100 sequential nonwarranty customer-paid service repairs described in the statute. *Id.* at *5. By specifically identifying the records a franchisee may submit to establish the retail rate, *Darling's Bangor Ford* explained that the Statute implicitly precluded any need to

7

submit additional records. *See id.* at *5-6. Furthermore, an alternate construction could run afoul of Section 1176's prohibition against requiring a franchisee to engage in an unduly burdensome process of providing records relevant to the process of determining the retail rate. *Id.* at *6. *Darling's Bangor Ford* noted that this was supported by the record before it since the production of additional repair orders would nearly triple the number of orders required by Section 1176. *Id.*

Second, *Darling's Bangor Ford* determined that the 100 sequential orders *did* include records for state inspections, routine maintenance, and accessories even though these repair orders were not considered in calculating the average retail rate. *Id.* at *7-9. In reaching this conclusion, *Darling's Bangor Ford* first explained that "warranty repairs" are not included in the 100 sequential nonwarranty customer-paid service repair orders by the plain language of the statute. *Id.* at *7. Regarding state inspections, routine maintenance, and accessories, *Darling's Bangor Ford* explained that Section 1176 provided separate processes for: 1) identifying repair orders that a franchisee may submit to the franchisor as part of the 100 sequential orders; and 2) calculating the average retail rate from within the 100 sequential orders. *Id.* at *7-8. *Darling's Bangor Ford* found that "[i]ts clear that the Legislature has characterized state inspections, routine maintenance…and accessories as forms of work that involve parts, because the statute refers to this work in the context of identifying which types of repairs can be included in the retail rate computation." *Id.* at *8. As a result, the Legislature would have included exclusionary language if it did not intend these types of repair orders to make up the set of 100 sequential orders. *Id.* *Darling's Bangor Ford* also noted that even though the 100 sequential orders may end up including many records that cannot be used to determine the retail rate for parts and that

8

the basis for the calculation may be too limited to allow a proper result, this "is a legislative judgment" and not for the courts to second guess. *Id.* at *8-9.

Third, *Darling's Bangor Ford* determined that "the District Court correctly construed the relevant provisions of section 1176" when it concluded that the "average dollar value markup" for parts used in qualifying nonwarranty repairs should be utilized to arrive at the average percentage markup. *Id.* at *9-10, 12. Under this approach, the markup is arrived at by calculating the cumulative difference between the dealer cost and the retail sales price for all such parts divided by the number of parts. *Id.* at *10. When that figure is divided (and then multiplied by 100) by the average dealer cost for those same parts, the average percentage markup is established. *Id.* In arriving at this decision, *Darling's Bangor Ford* noted that Section 1176 "also accommodates Darling's construction, which first identifies the percentage by which Darling's marks up a part from the dealer cost and then calls for an average of those percentages among the parts included in the 100 [qualifying] repair orders." *Id.* at *10. The approach advocated by Darling's, however, created a less accurate picture because "[a] franchisee's price structure is simply better reflected in an analysis where the magnitude of its price markups is tied to the relative value of the part itself." *Id.* at *11-12.

"In interpreting a statute, [the Court's] single goal is to give effect to the Legislature's intent in enacting the statute." *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 19, 107 A.3d 621 (citation omitted). Initially, the Court seeks to accomplish this goal by "examining the plain meaning of the statutory language and considering the language in the context of the whole statutory scheme." *Darling's v. Ford Motor Co.* 1998 ME 232, ¶ 5, 719 A.2d 111 (citations omitted). " A plain language interpretation should not be confused with a literal interpretation, however." *Dickau*, 2014 ME 158, ¶ 20, 107 A.3d 621 (citations omitted). "Rather, courts are

9

guided by a host of principles intended to assist in determining the meaning and intent of a provision even within the confines of a plain language analysis." *Id.* (citation omitted). One of these principles is to take "into account the subject matter and purposes of the statute, and the consequences of a particular interpretation." *Id.* ¶ 21 (citation omitted). "In determining a statute's 'practical operation and potential consequences,' [the court] may reject any construction that is 'inimical to the public interest' or creates absurd, illogical, unreasonable, inconsistent or anomalous results if an alternative interpretation avoids such results." *Id.* (quotation omitted); *see also Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 5, 719 A.2d 111 (the Court avoids "statutory constructions that create absurd, illogical or inconsistent results") (citation omitted).

If a statute is ambiguous, the court may look beyond the plain language of the statute and the context of the statutory scheme "to indicia of legislative intent such as the statute's history and its underlying policy." *Fuhrmann v. Staples*, 2012 ME 135, ¶ 23, 58 A.3d 1083 (quotation omitted). "A statute is ambiguous if it is reasonably susceptible to different interpretations." *Id.* (quotation omitted).

Here, the Board did not err in determining that Section 1176 does not require the submission of 100 sequential nonwarranty customer-paid service repair orders to be "consecutive." This is because a contrary interpretation would bring about the absurd result of requiring franchisee's to carry out 100 nonwarranty customer-paid service repair orders in a row, to the exclusion of other business. Additionally, the Board did not err in determining that Darling's need not submit the larger group of repair orders from which the 100 sequential orders were culled. This is because the plain language of Section 1176 is clear that the franchisee need

10

only submit the 100 sequential orders.[3] Furthermore, a contrary interpretation would run counter to Section 1176's prohibition against requiring a franchisee to engage in an unduly burdensome or time-consuming method. *See Darling's Bangor Ford*, 2006 Me. Super. LEXIS 110, *5-6; *see also* (R. 2708, ¶ 5) (the two sets of 100 sequential orders were culled from 398 and 629 consecutive repair orders, respectively, and would thus impose a much more burdensome requirement on Darling's).

The Board did, however, err in its determination that all 100 of the sequential orders need not "qualify" for calculation towards the average percentage markup. This is because the clear intent of Section 1176 was to designate a sufficient sample size from which to draw an average percentage markup without overburdening the franchisee.[4] If non-qualifying orders, such as state inspections, were included in the 100 sequential orders, the sample size from which the average percentage markup is drawn would vary from submission to submission. This variation would undermine the goal of establishing a representative sample. Furthermore, permitting non-qualifying orders to constitute part of the 100 sequential orders could lead to the absurd result of an average percentage markup being drawn from a very small, non-representative sample size.[5]

---

[3] The plain language referenced provides that "the retail rate customarily charged by the franchisee for parts may be established by submitting to the franchisor 100 sequential nonwarranty customer-paid service repair orders...." 10 M.R.S.A. § 1176.

[4] Section 1176 provides that the sample size could either be 100 sequential orders or 60 days of nonwarranty customer-paid service repair orders, whichever is less in terms of total cost. 10 M.R.S.A. § 1176. However, "[o]nly retail sales not involving warranty repairs, not involving state inspection, not involving routine maintenance such as changing the oil and oil filter and not involving accessories may be considered in calculating the average percentage markup." *Id.*

[5] The Court further notes that under the plain language of Section 1176, even if Darling's submitted a non-warranty repair order that involved a state inspection, routine maintenance, or accessories as well as another sale that would otherwise be eligible towards the calculation of the average percentage markup, the entire repair order cannot be counted towards the 100 sequential orders. While it is arguably a reasonable approach to count a repair order that involves qualifying and non-qualifying sales—such as a state inspection—towards the 100 sequential repairs so long as the non-qualifying repairs are excluded from the average percentage markup calculation, the Legislature did not choose this route. Instead, the Legislature broadly provided that only retail sales *not involving* warranty repairs, state inspection, routine maintenance and accessories may be considered in calculating the average percentage markup.

11

To the extent the intent and language of Section 1176 is reasonably susceptible to an alternate interpretation in which "non-qualifying" orders are included in the 100 sequential orders, the statute's legislative history indicates that the present formula was designed to lend certainty to the reimbursement process. *An Act to Amend the Motor Vehicle Franchise Law: Regarding L.D. 1294 Before the Comm. on Business, Research and Economic Development*, 121st Legis. (May 19, 2003) (testimony of Carol Kontos explaining findings of Commission appointed by the Business, Research and Economic Development Committee and recommending the establishment of "a statutory formula to determine retail price for parts" in order to "lend certainty to the reimbursement process"). Permitting the sample size upon which the formula is applied to vary from submission to submission would undermine this goal.

While *Darling's Bangor Ford* argues that the inclusion of this potentially absurd result was the Legislature's judgment and should not be second guessed by the courts, that case was decided without the benefit of the Law Court's reiteration that "[i]n interpreting a statute, our single goal is to give effect to the Legislature's intent in enacting the statute" and that courts may go "beyond the literal language of a statute if reliance on that language would defeat the plain purpose of the statute...." *Dickau*, 2014 ME 158, ¶ 19, 107 A.3d 621 (quotation omitted). Furthermore, the Court disagrees with the manner in which *Darling's Bangor Ford's* parsed the statutory sentence describing how the average percentage markup must be calculated.[6] In particular, *Darling's Bangor Ford* separated its analysis of "sales involving warranty repairs" from the other repairs excluded from the average percentage markup calculation, i.e. state inspections, routine maintenance and accessories. When read as a whole, the sentence supports the interpretation that the 100 sequential orders must all be "qualifying" orders because there

---

[6] The sentence provides, "Only retail sales not involving warranty repairs, not involving state inspection, not involving routine maintenance such as changing the oil and oil filter and not involving accessories may be considered in calculating the average percentage markup." 10 M.R.S.A. § 1176.

12

would otherwise be no need to carve out retail sales involving warranty repairs from the 100, as warranty repairs are by definition not included in the "100 sequential *nonwarranty* customer-paid service repair orders." 10 M.R.S.A. § 1176 (emphasis added). Accordingly, the Court reverses the Board's determination that Darling's successfully submitted 100 sequential nonwarranty customer-paid service repair orders to Chrysler for the purpose of establishing its average percentage markups.

Finally, the Board did not err in determining that the method utilized by Darling's to calculate its average percentage markups was appropriate under Section 1176 because that section does not set out a required method.[7] Instead, the statute prohibits franchisors from imposing unduly burdensome and time-consuming methods to calculate the average percentage markup, but otherwise permits a franchisee to "declar[e] the average percentage markup" without further guidance.[8] Chrysler's assertions to the contrary, *Darling's Bangor Ford* did not hold otherwise. While *Darling's Bangor Ford* pointed out shortcomings in the method proposed by Darling's in that case—and utilized by Darling's in the present case—it clearly stated that Section 1176 "also accommodates Darling's construction...." 2006 Me. Super. LEXIS 110, *10-11. This remains the case even though *Darling's Bangor Ford* determined that Darling's approach created a less accurate picture because "[a] franchisee's price structure is simply better

---

[7] Section 1176 provides, in pertinent part, that "the retail rate customarily charged by the franchisee for parts may be established by submitting to the franchisor" a number of qualifying repair orders "and declaring the average percentage markup." 10 M.R.S.A. § 1176. The statute further provides that only certain sales "may be considered in calculating the average percentage markup" and that "[a] franchisor may not require a franchisee to establish the average percentage markup by an unduly burdensome or time-consuming method...." *Id.*

[8] Furthermore, the Court notes that the Legislature amended Section 1176 in 2003 to the present language in lieu of more specific language regarding the method for calculating reimbursement rates. *See* 10 M.R.S.A. § 1176 (2002) ("A dealer may establish a retail rate, for purposes of warranty reimbursement, by calculating the markup ratio of all parts sold at retail for that franchise for the most recently completed calendar month and multiplying that markup ratio by the amount paid for each part at wholesale. The calculation must be a ratio, the numerator of which is the total price paid by the franchisee for those sum parts and the denominator of which is the total price of all parts provided at retail for that franchisee.")

reflected in an analysis where the magnitude of its price markups is tied to the relative value of the part itself." *Id.* at *11-12.

## IV. The Exchange Part Dispute, Count III

### A. Underlying Facts

Chrysler provides certain dealers, including Darling's, a small number of "exchange components" or "exchange parts" for warranty work at no cost. (R. 2709, ¶ 15.) Chrysler has never paid Darling's its average percentage markup on those parts. (*Id.*) Exchange parts are typically audio and electronic components that are not regularly stocked by dealers. (R. 2710, ¶ 16.) Dealers do not regularly store these components because they tend to be vehicle-specific, high-cost electronic components. (*Id.*) However, the class of exchange parts is growing because more parts are becoming electric, as opposed to mechanical. (*See id.*) When Darling's installs the equivalent nonwarranty exchange parts in a repair, it charges nonwarranty customers its average percentage markup. (*Id.* at ¶ 17.) Chrysler's exchange part system has been in place for decades and Darling's has utilized the system since at least 1994. (*See* R. 1755-1756.) Darling's did not, however, request a markup on any of the exchange parts used in its warranty repairs until December 21, 2011. (*See* R. 2711, ¶ 27.)

### B. The Board's Decision

The Board determined that Chrysler was required to "reimburse" Darling's for "exchange parts" at Darling's "retail rate," which was established by its average percentage markup. (R. 2712, ¶ 33.) This determination was informed heavily by the Legislature's intent when passing Section 1176. (R. 2711, ¶ 28.) Specifically, the Legislature was concerned about manufacturers using their superior bargaining power to reimburse dealers at artificially low prices for warranty repairs, thereby causing dealers to charge nonwarranty customers inflated repair prices. (*Id.*)

14

With this intent in mind and a focus on rules of interpretation that focus on the "practical operation and potential consequences" of a particular construction, the Board explained that Chrysler's "narrow construction" of the term "reimburse" would "thwart the purpose of § 1176: to enable…dealers to compete in the market place - to cover their overhead and realize a profit - without Maine consumers having to pay dealers more for nonwarranty repairs to their vehicles, than new car manufacturers pay dealers for warranty repairs." (R. 2712, ¶¶ 32, 33.) Furthermore, the Board pointed to *Darling's v. Ford*, 1998 ME 232, 719 A.2d 111 as an analogous situation in which the Law Court refused to strictly construe the language of Section 1176 when it determined that the average percentage markup applied to sublet warranty repairs, even though they were not performed by the dealer.

The Board then explained that that it did not have the power to issue injunctions and thus denied Darling's request to make Chrysler continue to pay Darling's its average percentage markup on exchange parts. (R. 2713, ¶ 37.) However, the Board explained that pursuant to Section 1188(2) and its interpretation of Section 1176, Chrysler was required to pay Darling's established average percentage markup on exchange parts. (*Id.* at ¶ 39.) Finally, the Board imposed "the minimum Civil Penalty of $1,000.00 for each of the thirteen 60-day periods that Chrysler violated Section 1176 by not paying the average percentage markup on exchange parts. (*Id.* at ¶ 36.)

### C. Discussion

#### i. *Whether the Board Erred in Determining that Exchange Parts Must be Reimbursed at Darling's Retail Rate Customarily Charged*

Chrysler contends that the Board erred by requiring it to reimburse Darling's for any exchange parts provided at the "retail rate" customarily charged by Darling's. This is because the plain language of Section 1176 is inapplicable to "no cost" exchange parts since there is no

15

cost for Chrysler to "reimburse." Chrysler supports this argument by pointing to dictionary definitions of the term "reimburse" and statutes in other jurisdictions that, unlike Section 1176, explicitly provide for the reimbursement of parts provided at no cost for use in warranty repairs.[9] Chrysler further contends that the Board's Decision yields an illogical result insofar as there is no cost basis upon which to calculate a markup when the dealer pays nothing for the part. Chrysler also argues that the Board erred because the record indicates Chrysler, not Darling's, bears the overhead costs associated with exchange parts and case law has rejected the argument that Section 1176 requires a manufacturer to reimburse a dealer for overhead costs stemming from parts purchased by a manufacturer and sold to retail customers. *See General Motors Corp. v. Darling's*, 324 F. Supp. 2d 257, 271 (D. Me. 2004), *aff'd* 444 F.3d 98 (1st Cir. 2006).

Darling's responds that the Board properly saw Chrysler's decision to provide parts at "no cost" as an impermissible attempt to work around the obligation imposed under Section 1176 to reimburse dealers for parts at their average percentage markup. Darling's further argues that "reimburse" means to pay back for a loss incurred, which Darling's incurs every time Chrysler fails to provide Darling's its statutorily required markup. Darling's explains that it determines the retail price to charge nonwarranty customers by considering: 1) the price Darling's paid Chrysler to obtain the part; 2) an amount to cover Darling's overhead; and 3) an amount to allow a profit. (*See* R. 1622-1623.) With respect to exchange parts, Darling's contends that the first factor is inapplicable, but the second two apply and constitute a loss that must be reimbursed. Darling's also argues that the statute's relied upon by Chrysler are not persuasive because Section 1176

_____

[9] Specifically, Chrysler points to: Fla. Stat. § 320.696(3)(c), "If a licensee furnishes a part or component to a [dealer] at no cost to use in performing repairs under a…warranty repair, the licensee shall compensate the dealer for the part or component in the same manner as warranty parts compensation under this subsection, less the dealer cost for the part"; and Va. Code. Ann. § 46.2-1571(5), "If a manufacturer… furnishes a part to a dealer at no cost for use by the dealer in performing work for which the manufacturer…is required to compensate the dealer under this section, the manufacturer…shall compensate the dealer for the part in the same manner as warranty parts compensation."

16

contains broad language that serves to accomplish the same purpose as those statutes. In addition, Darling's responds that the exchange parts have a readily determinable cost based on their nonwarranty price. Finally, Darling's argues that there is ample evidence demonstrating that there is no need to treat exchange parts differently from other parts used in repairs and that the "relatively small sub-group" of exchange parts is growing as technology advances and the complexity of electronics evolves.

Section 1176 provides, in pertinent part, that:

> If a motor vehicle franchisor requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty created by the franchisor, the franchisor shall properly and promptly fulfill its warranty obligations... and...shall reimburse the franchisee for any parts so provided at the retail rate customarily charged by that franchisee for the same parts when not provided in satisfaction of a warranty.

10 M.R.S. § 1176.

As stated *supra* section III(C), "[i]n interpreting a statute, [the Court's] single goal is to give effect to the Legislature's intent in enacting the statute." *Dickau v. Vt. Mut. Ins. Co.*, 2014 ME 158, ¶ 19, 107 A.3d 621 (citation omitted). The Court seeks to accomplish this goal by "examining the plain meaning of the statutory language and considering the language in the context of the whole statutory scheme." *Darling's v. Ford Motor Co.* 1998 ME 232, ¶ 5, 719 A.2d 111 (citations omitted). When carrying out this analysis, the Court takes "into account the subject matter and purposes of the statute, and the consequences of a particular interpretation." *Dickau*, 2014 ME 158, ¶ 21, 107 A.3d 621 (citation omitted). "In determining a statute's 'practical operation and potential consequences,' [the court] may reject any construction that is 'inimical to the public interest' or creates absurd, illogical, unreasonable, inconsistent or anomalous results if an alternative interpretation avoids such results." *Id.* (quotation omitted); *see also Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 5, 719 A.2d 111 (the Court avoids

17

"statutory constructions that create absurd, illogical or inconsistent results") (citation omitted). If a statute is ambiguous, the court may look beyond the plain language of the statute and the context of the statutory scheme "to indicia of legislative intent such as the statute's history and its underlying policy." *Fuhrmann v. Staples*, 2012 ME 135, ¶ 23, 58 A.3d 1083 (quotation omitted). "A statute is ambiguous if it is reasonably susceptible to different interpretations." *Id.* (quotation omitted).

Here, the Board did not err in determining that Chrysler was required to reimburse Darling's at its "retail rate" for exchange parts. (R. 2712, ¶ 33.) This is because the plain language of Section 1176 was intended to guarantee that franchisors reimburse franchisees for parts used in warranty repairs "at the retail rate customarily charged by [the] franchisee for the same parts when not provided in satisfaction of a warranty." 10 M.R.S.A. § 1176. Contrary to Chrysler's assertions, the term "reimburse" is clearly tied to the retail rate that the franchisee customarily charges for parts when used in nonwarranty repairs. There is no indication that the amount "reimbursed" is the amount the franchisor charges the franchisee for the part when used in a warranty repair.

Furthermore, this interpretation is consistent with the Law Court's determination in *Darling's v. Ford Motor Co.* that Section 1176 applies to warranty repairs sublet by a dealer who cannot provide the specialized labor or materials required for the repair. 1998 ME 232, ¶¶ 20-21, 219 A.2d 111. In that case, the Law Court explained that Section 1176 applied because the statute "governs reimbursement of all repairs in which a manufacturer requires or permits a motor vehicle franchisee to perform labor or provide parts in satisfaction of a warranty," and "[s]ince Section 1176 applies to all warranty repairs, it applies to warranty repairs accepted by dealers who lack the ability to make all repairs on their premises, as well as to dealers who have

18

the ability to make all repairs on their premises." *Id.* ¶ 21 (quotation omitted). The Law Court's emphasis on Section 1176 applying to *all* warranty repairs is consistent with the Board's determination that Section 1176 applies to exchange parts.

In addition, even if the term "reimburse" created sufficient ambiguity for the Court to resort to indicia of legislative intent beyond the plain terms of the statute, the legislative history behind Section 1176 supports the Board's interpretation. This is because Section 1176 was enacted in recognition of "[t]he disparity in bargaining power between automobile manufacturers and their dealers" and designed to "protect dealers from actions by manufacturers that were perceived as abusive and oppressive." *Acadia Motors, Inc. v. Ford Motor Co.*, 844 F. Supp. 819, 827-28 (D. Me. 1994); *aff'd in part, rev'd in part on other grounds*, 44 F.3d 1050 (1st Cir. 1995) (citing Me. L.D. 1878, 109th Leg., 2d Sess. (Statement of Fact).) In particular, the Legislature wanted to prevent manufacturers, "'unwilling to pay the fair and full price for repairs made necessary when their automobiles failed to meet warranty standards,' to force dealers to shift costs of performing warranty work to nonwarranty customers." *Id.* (quoting Me. L.D. 1878, 109th Leg., 2d Sess. (Statement of Fact)); *see also Darling's v. Ford Motor Co.*, 1998 ME 232, ¶ 10, 719 A.2d 111 (noting that Legislature amended Section 1176 in 1979 to introduce the term "retail rate" in recognition of "the Legislature's concern that manufacturers were using their superior bargaining power to reimburse dealers at artificially low prices for warranty repairs, thereby causing dealers to charge nonwarranty customers inflated repair prices."). While the statute was initially focused on ensuring franchisees received their retail rate for labor, it was amended in 1991 to "require that dealers be compensated for parts in the same manner as labor when work is performed under a manufacturer warranty." Me. L.D. 1235, 115th Leg., 1st Sess. (Statement of Fact). Accordingly, the Board's interpretation of Section 1176 is consistent with

19

the statute's intended purpose in that it refuses to recognize an exception to Section 1176 that could ultimately prove harmful to Maine consumers. (*See* R. 2720, ¶ 16) (noting testimony that the class of exchange parts is growing because certain parts are now considered electrical rather than mechanical).

Chrysler's arguments to the contrary are not persuasive. While the Legislature could have made an explicit statement that parts provided at no cost are subject to markup like the Florida and Virginia statutes, the fact that the Maine Legislature chose to address this issue using the broader language discussed above does not negate the import of that plain language or the clear legislative intent behind the statute. Furthermore, Chrysler's argument that the Board's conclusion is illogical because you can't markup a part that costs nothing ignores the fact that Chrysler provided a non-zero cost for each exchange part through its so-called dealer net price. (*See* R. 1668-1670; 1674; 4350-4315; *see also* R. 4337-4439.) Similarly, Chrysler's argument that the Board's Decision should be reversed because there was no evidence that Darling's incurred overhead expenses due to exchange parts is factually incorrect (*see* R. 1619; 1667; 1753-1755; 1826), and, in any event, not a factor in the Court's interpretation of Section 1176.[10]

  ii. *Whether the Board Erred in Determining when Imposing Penalties etc.*

Chrysler contends that even if exchange parts are subject to reimbursement under Section 1176, the Board erred in assessing $13,000 in civil penalties under 10 M.R.S.A. § 1171-B(3) because the Board improperly based the penalty on a continuing violation that lasted over thirteen 60-day periods between December 21, 2011 and January 7, 2014. Section 1171-B(3), however, imposes penalties based on transactions within a 60-day period, under which multiple transactions are deemed a single violation. Chrysler argues that, at most, the civil penalty

---

[10] Assuming without specifically deciding that Section 1176 was not drafted to ensure that dealers have their overhead costs covered and realize a profit, this does not alter the Court's determination as to the proper interpretation of Section 1176 as set forth above.

imposed by the Board should be $4,000 because the violations occurred within four sixty-day periods, at $1,000 a piece.[11]

Darling's responds the Board did not err because the penalty was properly based on its finding that Chrysler had adopted a systemic policy that constituted a violation of each of the successive 60-day periods following Darling's initial claim in December of 2011. Darling's further argues that even if the Board erred, it cannot reduce the penalty to $4,000 as requested by Chrysler. Instead, the Court must remand the matter to the Board for a new determination of civil penalties consistent with Section 1171-B(3).

10 M.R.S. § 1171-B(3) provides that:

> If the board determines after a proceeding conducted in accordance with this chapter that a manufacturer or distributor is violating or has violated any provision of this chapter or any rule or order of the board issued pursuant to this chapter, the board shall levy a civil penalty of not less than $ 1,000 nor more than $ 10,000 for each violation. If the violation involves multiple transactions within a 60-day period, these multiple transactions are deemed a single violation.
>
> In determining the amount of a civil penalty levied under this chapter, the board shall consider:
>
> A. The seriousness of the violation, including but not limited to the nature, circumstances, extent and gravity of the prohibited acts and the harm or potential harm created to the safety of the public;
> B. The economic damage to the public caused by the violation;
> C. Any previous violations;
> D. The amount necessary to deter future violations;
> E. Efforts made to correct the violation; and
> F. Any other matters that justice may require.

10 M.R.S. § 1171-B(3) (2015).

Here, the Board erred by imposing penalties on Chrysler based on a continuing violation of Section 1176 through thirteen 60-day periods. This is because when Section 1171-B(3) is

---

[11] Darling's claims were made on the following dates and could be grouped into sixty-day periods as follows: First sixty-day period: 12/21/11, 1/11/12, 1/17/12; Second sixty-day period: 11/2/12, 12/20/12; Third sixty-day period: 1/14/13, 2/13/13, 2/18/13, 3/7/13; Fourth sixty-day period: 4/10/13, 4/18/13, 4/19/13, 4/26/13, 5/1/13, and 5/14/13.

21

read in context with Section 1176, it is clear that the mandatory civil penalty is triggered by actual claims filed by franchisees, not the amount of time following a claim as to which a franchisor persists in holding an erroneous position. Section 1171-B(3) provides that the Board "shall levy a civil penalty...for each violation" of the Dealers Act. The statute then provides that multiple transactions occurring within a 60-day period are deemed a single violation for purposes of Section 1171-B(3). This language triggers the mandatory civil penalty based on a particular violation of the Dealers Act. While the statute limits the triggering of the mandatory civil penalty to individual violations that occur within separate 60-day periods, it does not indicate that an erroneous interpretation of the Dealers Act, devoid of concrete action, triggers a mandatory penalty for every 60-day period the interpretation is held. Stated another way, Section 1171-B(3) contemplates the mandatory civil penalty being triggered by a claimed violation, not a continuing pattern of behavior. This interpretation is further supported by Section 1176, which requires a franchisee to assert a claim for reimbursement in order to initiate the process for adjudication set out therein.[12] Clearly, Section 1176 and Section 1171-B(3) contemplate imposing the mandatory civil penalty based on particular claims that demonstrate a violation of Section 1176, *not* on erroneous interpretations that are held, but not acted upon. While a franchisor's insistence upon an erroneous interpretation does not trigger the mandatory civil penalty absent a specific act, this does not mean the Board cannot take this behavior into account. Indeed, Section 1171-B(3) requires the Board to consider previous violations, the

---

[12] *See* 10 M.R.S.A. § 1176 ("Any claim made by a franchisee for compensation for parts provided or for reimbursement for labor performed in satisfaction of a warranty must be paid within 60 days of its approval. All the claims must be either approved or disapproved within 60 days of their receipt. A claim may be submitted within 90 days after the performance of services.... When a claim is disapproved, the franchisee that submitted the claim must be notified in writing of the claim's disapproval within that period, together with the specific reasons for its disapproval.... In any claim that is disapproved by the manufacturer, and the dealer brings legal action to collect the disapproved claim and is successful in the action, the court shall award the dealer the cost of the action together with reasonable attorney fees...").

22

amount necessary to deter future violations, efforts made to correct the violation and any other matters that justice may require when determining the amount of the penalty. *See* 10 M.R.S.A. § 1171-B(3)(C), (D), (E), & (F). Accordingly, the Court remands the determination of what penalty to impose on Chrysler under Section 1171-B(3) to the Board for further proceedings consistent with this Order.

## V. The Award of Attorney Fees and Costs to Darling's

### A. The Board's Decision

The Board submitted its Order on Darling's motion for attorney fees on April 4, 2014. (R. 2714-2717.) The Board ordered Chrysler to pay Darling's $179,388.95 in attorney fees and $8,013.60 in costs. (R. 2714.) The Board rejected Chrysler's argument that the law does not entitle Darling's to fees or costs explaining that Darling's prevailed in its action under section 1171-B(3) and, as a result, is entitled to recover its attorney fees under 10 M.R.S.A. § 1173. (R. 2714-2715.) The Board also rejected Chrysler's argument that Darling's should not recover fees in connection with its unsuccessful motion for summary judgment because it ignores the Law Court's statement that "[t]he result is what matters." (R. 2715) (quoting *Advanced Const. Corp. v. Pilecki*, 2006 ME 84, ¶ 32, 901 A.2d 189).) In light of the fact that Darling's prevailed on three of the four issues raised in its motion for summary judgment and the close relation between the "exchange" and "core" claims, the Board found that Darling's was entitled to all of the $19,864.87 in fees that Chrysler attributes to the summary judgment motion, minus $3,973 for time devoted to Count IV. (*Id.*)

The Board also awarded Darling's $8,013.60 in costs pursuant to 14 M.R.S.A. §§ 1502-B, 1502-C, 1502-D, *Arsenault v. Crossman*, 1997 ME 92, 696 A.2d 418, *Darling's v. Ford Motor Co.*, Pen. Super. CV-01-14, and *Poussard v. Commercial Credit Plan, Inc. of Lewiston*,

23

479 A.2d 881 (Me. 1984). This award excluded $242.00 in costs for a July 31, 2013 deposition and $516.25 for a transcript from January 7, 2014. (R. 2716.)

## B. Discussion

Chrysler argues that the Board erred in awarding Darling's attorney fees and costs because Darling's only prevailed under section 1171-B, which does not provide for the award of said fees or costs. Chrysler contends that sections 1173 and 1176 of title 10 are not implicated in the present case because the Board denied Darling's request for an injunction and the Board does not have the authority to award damages. Chrysler further argues that even if Darling's was entitled to attorney fees, the Board erred by awarding Darling's $19,864.87 in attorneys fees for prosecuting an unsuccessful motion for summary judgment. Chrysler also argues that the Board erred by awarding $3,927.64 in costs associated with the trial and deliberation transcript, postage, and mileage to places other than the trial location because these costs are not authorized for recovery by any statute or rule.

Darling's responds that it is entitled to its attorney fees and costs because Chrysler violated Section 1176, and Section 1171-B provides dealers with a remedy for the violation of another section of the Dealers Act, such as Section 1176. Darling's further responds that the award of attorney fees related to its motion for summary judgment was appropriate because the Board determined that Darling's prevailed on three of the four counts and the award of attorney fees should "focus on the overall relief awarded to the prevailing party." *Advanced Constr. Corp. v. Pilecki*, 2006 ME 84, ¶ 32, 901 A.2d 189. Finally, Darling's replies that the Board correctly awarded Darling's its costs incurred in litigating this matter because the costs at issue are properly considered as a necessary element of legal services that an attorney provides to a client and within the Board's broad discretion over the award of costs to dealers.

24

Section 1188(4) provides that the Board "shall award costs and attorney's fees pursuant to section 1173." 10 M.R.S. § 1188(4). Section 1173 provides, in pertinent part:

> Any franchisee or motor vehicle dealer who…has been otherwise adversely affected as a result of… any practice declared unlawful by this chapter may bring an action for damages and equitable relief, including injunctive relief. When the franchisee or dealer prevails, the court shall award attorney's fees to the franchisee or dealer, regardless of the amount in controversy, and assess costs against the opposing party. For the purpose of the award of attorney's fees and costs, whenever the franchisee or dealer is seeking injunctive or other relief, the franchisee or dealer may be considered to have prevailed when a judgment or other final order providing equitable relief is entered in its favor….

10 M.R.S. § 1173 (2015.) Furthermore 10 M.R.S.A. § 1176 provides that "any claim that is disapproved by the manufacturer, and the dealer brings legal action to collect the disapproved claim and is successful in the action, the court shall award the dealer the cost of the action together with reasonable attorney fees." 10 M.R.S.A. § 1176. While the Board lacks jurisdiction over actions seeking damages pursuant to the Dealers Act, it is empowered to "review complaints, issue written decisions and orders, levy civil penalties, and attorney fees and costs…." *Ford Motor Co. v. Darling's*, 2014 ME 7, ¶43, 86 A.3d 35.

Here, the Board awarded attorney fees and costs based on its determination that Darling's prevailed on Counts I, II and III of its Complaint. As discussed *supra* section III(C), the Board erred by ruling in favor of Darling's on Counts I and II of its Complaint. Accordingly, the Court remands to the Board the determination of the amount of attorney fees and costs Darling's is entitled to for prevailing on Count III of its Complaint. That determination must be made in light of this Order's adjudication of Chrysler's objections to the Board's award of attorney fees and costs.

First, the Court concludes that the Board did not err in determining that Darling's was entitled to its attorney fees and costs generated by the Counts on which it prevailed. This is

25

because the Board's Decision concluded, in pertinent part, that Darling's prevailed on Count III of its Complaint because Chrysler violated Section 1176 by not reimbursing Darling's in accordance therewith for exchange parts used in warranty repairs. The Decision also determined that it was required to impose civil penalties on Chrysler under Section 1171-B due to this violation of Section 1176. Since Section 1173 requires the award of attorney fees and costs when a dealer prevails in an action based on a violation of the Dealers Act, such as Section 1176, and the Board found that Darling's did exactly that in Count III, the Board did not err in determining that Darling's was entitled to the attorney fees and costs generated by Count III. The fact that the Board cannot award damages to Darling's under Section 1173 does not change the fact that Section 1188(4) explicitly requires the Board to award costs and attorney fees pursuant to Section 1173. 10 M.R.S.A. § 1188(3); *see also Ford Motor Co. v. Darling's*, 2014 ME 7, ¶43, 86 A.3d 35.

Second, the Board did not err or abuse its discretion by awarding Darling's attorney fees for its work on an unsuccessful motion for summary judgment because Darling's ultimately prevailed on three of the four issues raised in the motion. This is because Section 1173 broadly provides for the award of attorney fees and costs "[w]hen the franchisee or dealer prevails," and nowhere limits the award to fees strictly generated in support of action that directly brings about a successful result. 10 M.R.S.A. § 1173.

This construction is supported by *Advanced Constr. Corp. v. Pilecki*, in which the Law Court explained—in the context of distinguishing between claims authorizing attorney fees and those under which said fees were not available—that "it is appropriate for the trial court to focus on the overall relief awarded to the prevailing party." 2006 ME 84, ¶ 32, 901 A.2d 189. In support of this assertion, *Pilecki* quoted from an opinion of the United States Supreme Court

26

providing that "[i]n these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or a failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)); *see also Coulter v. State of Tenn.*, 805 F.2d 146, 151-152 (6th Cir. 1986) (holding that attorney fees were warranted for work on unsuccessful summary judgment motion because it narrowed the issues and helped the party prevail at trial); *Luessenhop v. Clinton County*, 558 F. Supp. 2d 247, 256-257 (N.D.N.Y. 2008) (prevailing party not limited to recovery on successful motions alone, but may recover for unsuccessful motions as long as they are not frivolous); *Frevach v. Multnomah County*, 2001 U.S. Dist. LEXIS 22255, *17-18 (D. Or. Dec. 18, 2001) (attorney fees may be appropriately awarded for time spent on unsuccessful motions if the party is later successful on a claim addressed in the motion); *but see Dinan v. Alpha Networks, Inc.*, 2015 U.S. Dist. LEXIS 50093, *17, *30 (determining that attorney not entitled to fees or charges related to unsuccessful motion because the unsuccessful work could be demarcated from successful work). Accordingly, it was not error for the Board to award attorney fees in light of its determination that Darling's subsequently prevailed on three of the four issues raised in the unsuccessful motion. [13]

Turning to the Board's award of costs to Darling's, the Court emphasizes that it reviews the Board's decision for errors of law or an abuse of discretion. *See Poland v.* Webb, 1998 ME 104, ¶ 12, 711 A.2d 1278. In its motion for attorney fees and costs, Darling's requested $8,771.85 in costs. (R. 2716, ¶ 8; R. 2657.) Of the $8,771.85 in costs requested, the Board awarded Darling's $8,013.60. (R. 2716, ¶ 8.) This excluded $242.00 for a July 31, 2013

---

[13] As noted, the Board must revisit this issue in light of the Court's determination that the Board erred by ruling in favor of Darling's on Counts I and II of its Complaint.

27

deposition and $516.25 for a January 7, 2014 deliberation transcript. (*Id.*) Of the $8,013.60 awarded for costs, Chrysler challenges the award of $3,174.00 for the trial transcript.[14] Chrysler also challenges the award, as attorney fees, of $173.13 for postage and $64.26 for mileage to places other than the place of trial.

Section 1173 provides that the "court shall award attorney's fees" to the prevailing franchisee or dealer, "regardless of the amount in controversy, and assess costs against the opposing party." 10 M.R.S.A. § 1173. Because Section 1173 does not define what costs are assessable, the Court look to additional rules and statutes to inform its interpretation. Specifically, M.R. Civ. P. 54(f) and 14 M.R.S.A. §§ 1502-B, 1502-C, and 1502-D inform what costs are available for assessment.

Here, the Board abused its discretion in awarding Darling's $3,174.00 in costs for preparation of the trial transcript because this cost is not included in or authorized by any of the aforementioned authorities. *See Poland v. Webb*, 1998 ME 104, ¶ 16, 711 A.2d 1278 (finding abuse of discretion for award of costs of lodging because said costs "are not recoverable pursuant to any rule or statute"). The Board did not, however, abuse its discretion in awarding Darling's $173.13 for postage and $64.26 for mileage to places other than the place of trial because it could have reasonably found that these expenses were a necessary element of legal services Darling's attorney provided to it. *See Darling's v. Ford Motor Co.*, PENSC-CV-01-14 at 2 )Me. Super. Ct., Pen. Cty., Apr. 11, 2005).

## VI. Conclusion

For the reasons discussed above, it is hereby ORDERED AND ADJUDGED AS FOLLOWS:

---

[14] Chrysler also argued the Board erred by awarding costs for preparation of the deliberation transcript, but the record is clear that the Board did not award these costs. (R. 2716, ¶ 8).

## Counts I and II of Darling's Complaint

The Board did not err in determining:

- Section 1176 does not require the submission of 100 sequential nonwarranty customer-paid service repair orders to be "consecutive" in the sense that the dealer may not perform anything but 100 sequential nonwarranty customer-paid service repair orders in a row;

- Section 1176 does not require the submission of the larger group of repair orders from which the 100 sequential nonwarranty customer-paid service repair orders are drawn;

- Darling's method for calculating its average percentage markup was appropriate under Section 1176.

The Board erred as a matter of law in its determination that all 100 of the sequential nonwarranty customer-paid service repair orders required to calculate an average percentage markup under Section 1176 need not qualify to be used towards the calculation of the average percentage markup. To the contrary, all 100 sequential nonwarranty customer-paid service repair orders must be utilized in calculating the average percentage markup. This means that retail sales involving warranty repairs, state inspection, routine maintenance such as changing the oil and oil filter, and sales involving accessories do not constitute part of the 100 sequential nonwarranty customer-paid service repair orders under Section 1176. Accordingly, the Court reverses the Board's determination that Darling's prevailed on Counts I and II of its Complaint.

## Count III of Darling's Complaint

The Board did not err in determining that exchange parts Chrysler provides to Darling's for warranty repairs must be reimbursed at the retail rate customarily by Darling's.

The Board did err, however, by imposing $13,000 in civil penalties under 10 M.R.S.A. § 1171-B(3) against Chrysler because the penalty is based on specific claims filed by franchisees, not a continuing violation based on successive 60-day periods during which the franchisor

maintains the same erroneous position. Accordingly, the Court remands the determination of what penalty to impose against Chrysler under Section 1171-B(3) for further proceedings consistent with this Order.

### The Board's Award of Attorney Fees and Costs to Darling's

The Board's award of attorney fees to Darling's is remanded for further proceedings consistent with this Order in light of the Court's ruling as to Counts I and II of Darling's Complaint. Specifically, the Board is instructed to determine the amount of attorney fees Darling's is entitled to for prevailing under Count III of its Complaint with the following rulings in mind:

- Darling's is entitled to attorney fees for prevailing on Count III of its Complaint;

- The Board did not err in awarding Darling's attorney fees for portions of work it performed on an unsuccessful motion for summary judgment;

- The Board did not err or abuse its discretion by awarding Darling's attorney fees that included $173.13 for postage and $64.26 for mileage to places other than the place of trial; and

- The Board abused its discretion by awarding $3,174.00 in costs for the preparation of the trial transcript because this cost is not authorized by any rule or statute.

Pursuant to M.R. Civ. P. 79(a), the Clerk is hereby directed to incorporate this Order by reference in the docket.

Dated: June 27, 2016

Michaela Murphy
Justice, Business & Consumer Court

Entered on the Docket: 6-27-16
Copies sent via Mail___ Electronically ✓

30